TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SHAWN J. NELSON (Cal. Bar No. 185149)
Assistant United States Attorney
Chief, International Narcotics, Money
 Laundering, & Racketeering Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: 213-894-5339
     Facsimile: 213-894-0142
     E-mail: shawn.nelson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:07-CR-01172-DDP-32 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM RE: JAVIER PEREZ |
| v. | Hearing Date: September 27, 2021 |
| SERGIO PANTOJA, et al., [#32 JAVIER PEREZ], | Hearing Time: 1:00 p.m. Location: Courtroom of the  Honorable Dean D. Pregerson |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Shawn J. Nelson,

hereby files its Sentencing Memorandum regarding defendant Javier

Perez.

///

///

1    This Sentencing Memorandum is based upon the attached memorandum

2   of points and authorities, the files and records in this case, and

3   such further evidence and argument as the Court may permit.

4   Dated: August 26, 2021            Respectfully submitted,

5                                     TRACY L. WILKISON
                                      Acting United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                      /S/ *Shawn J. Nelson*
                                      SHAWN J. NELSON
10                                    Assistant United States Attorney

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.................................................ii

GOVERNMENT'S SENTENCING POSITION.....................................1

I.   INTRODUCTION AND RECOMMENDATION.................................1

II.  STATEMENT OF FACTS.............................................2

III. GUIDELINES CALCULATION........................................4

     A.   Kidnapping Guidelines....................................5

          1.   This Court Should Find an Offense Level of 43
               Pursuant to USSG § 2A4.1(b)(7)(A) because
               Defendant Committed an Attempted Murder during
               the Kidnapping.......................................5

          2.   Alternatively, the Court Should Find an Offense
               Level of 41 Pursuant to USSG § 2A4.1(b)(7)(B)
               because Defendant Attempted to Murder during the
               Kidnapping...........................................6

          3.   Alternatively, the Court Should Find an Offense
               Level of 37 Pursuant to USSG § 2A4.1(b)(7)(B)
               because Defendant Conspired to Murder in
               Connection with the Kidnapping.......................8

     B.   Murder-Related Guidelines................................8

     C.   Whether Computing the Kidnapping or Murder Guidelines,
          the Four-Level Increase for "Permanent or Life-
          Threatening Bodily Injury" Should Apply because the
          Victim did, in Fact, Sustain a Permanent and Life-
          Threatening Injury.......................................9

IV.  THE GUIDELINES AND THE SECTION 3553(A) FACTORS...............14

     A.   The Guidelines are the Starting Point in Determining
          an Appropriate Sentence.................................14

     B.   Analysis of the Section 3553(a) Factors.................15

V.   CONCLUSION...................................................18

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                <u>PAGE(S)</u>

3

Cases:

4

<u>BMW of North America, Inc. v. Gore</u>,
   517 U.S. 559 (1996) ............................................... 8

5

<u>Kimbrough v. United States</u>,
   552 U.S. 85 (2007) ............................................... 6

6

<u>Pepper v. United States</u>,
   131 S. Ct. 1229 (2011) .......................................... 7

7

<u>RJR Nabisco, Inc. v. European Community</u>,
   136 S.Ct. 2090 (2016) .......................................... 13

8

<u>United States v. Becerril-Lopez</u>,
   541 F.3d 881 (9th Cir. 2008) ................................... 18

9

<u>United States v. Booker</u>,
   543 U.S. 220 (2005) ............................................ 14

10

<u>United States v. Bryant</u>,
   913 F.3d 783 (9th Cir. 2019) .............................. 11, 12

11

<u>United States v. Cantrell</u>,
   433 F.3d 1269 (9th Cir. 2006) ............................. 14, 15

12

<u>United States v. Carty</u>,
   520 F.3d 984 (9th Cir. 2008) .............................. 14, 15

13

<u>United States v. Chao Fan Xu</u>,
   706 f.3d 965 (9th Cir. 2013) ................................... 12

14

<u>United States v. Cree</u>,
   166 F.3d 1270 (8th Cir. 1999) .................................. 10

15

<u>United States v. Farouil</u>,
   124 F.3d 838 (7th Cir. 1997) ................................... 12

16

<u>United States v. Goldberg</u>,
   491 F.3d 668 (7th Cir. 2007) .................................... 6

17

<u>United States v. Greer</u>,
   285 F.3d 158 (2d Cir. 2002) .................................... 13

18

<u>United States v. Guerrero-Velasquez</u>,
   434 F.3d 1193 (9th Cir. 2006) .................................. 18

19

<u>United States v. Hinton</u>,
   31 F.3d 817 (9th Cir. 1994) .................................... 11

20

<u>United States v. Knows His Gun</u>,
   438 F.3d 913 (9th Cir. 2006) ................................... 15

21

<u>United States v. Morgan</u>,
   238 F.3d 1180 (9th Cir. 2001) .................................. 11

22

<u>United States v. Nichols</u>,
   464 F.3d 1117 (9th Cir. 2006) .................................. 15

23

<u>United States v. Rivera</u>,
   527 F. 3d 891 (9th Cir. 2008) ................................... 7

24

<u>United States v. Zakhor</u>,
   58 F.3d 464 (9th Cir. 1995) .................................... 17

25

<u>Williams v. New York</u>,
   337 U.S. 241 (1949) ............................................. 7

26

27

28

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Statutes:

18 U.S.C. § 1119.............................................................13
18 U.S.C. § 3553.....................................15, 16, 17, 18
18 U.S.C. § 3661..............................................................7

USSG:

USSG § 2A4.1..................................................................5
USSG § 2A4.1(a)..........................................................5, 6, 8
USSG § 1A1.1.................................................................6
USSG § 2A2.1(b)(1)...........................................................9
USSG § 2A4.1(b)(2)...........................................................9
USSG § 2A4.1(b)(7)(A)........................................................5
USSG § 2A4.1(b)(7)(B)..................................................6, 7, 8

1

<u>**GOVERNMENT'S SENTENCING POSITION**</u>

2

**I.    INTRODUCTION AND RECOMMENDATION**

3    Defendant is before the Court for re-sentencing.  Defendant was

4 convicted by a jury in 2012 following a trial in which the evidence

5 showed that, mere days after his release from prison on an extortion

6 conviction, defendant conspired to kill, and did, in fact, attempt to

7 kill, G.M., a fellow 18th Street gang member.  Defendant kidnapped

8 G.M. and took him to Mexico to kill him because the Mexican Mafia had

9 placed a "greenlight" on the 18th Street gang because G.M. had killed

10 an infant while trying to kill a street vendor who was resisting the

11 18th Street gang's extortion.  Based on this conduct, defendant was

12 convicted of VICAR conspiracy to murder, VICAR conspiracy to kidnap,

13 VICAR attempted murder, conspiracy to kidnap, and RICO conspiracy.

14 The Ninth Circuit Court of Appeals reversed defendant's VICAR

15 attempted murder on jurisdictional/extraterritoriality grounds, but

16 upheld all of defendant's other convictions.

17    Following remand, the United States Probation ("USPO") issued a

18 Presentence Report ("PSR") and calculated an offense level of 43 and

19 a criminal history category of VI, which results in in a guidelines

20 range of life imprisonment.

21    Because the Ninth Circuit's decision results in only a technical

22 change to the calculation of the sentencing guidelines and does not

23 materially change the type of charges for which defendant was

24 convicted, and because defendant's conduct was extremely serious and

25 depraved, the government recommends that the court impose the same

26 sentence as it did in the original sentencing, that is, life

27 imprisonment.

28

## II.  STATEMENT OF FACTS

For years prior to 2007, the Columbia Lil' Cycos clique of the 18th Street Gang (the "CLCS Organization") effectively controlled the mixed commercial/residential neighborhood of MacArthur park.  CLCS Organization members used violence and intimidation to control the illegal activity taking place within that territory.  This activity included a large-scale drug trafficking network in which the CLCS Organization's drug suppliers, drug dealers, and facilitators worked together to ensure that drugs, and crack cocaine in particular, were available for sale 24 hours a day, 365 days a year.

The CLCS Organization also taxed legitimate business people, including street vendors, for the "right" to conduct their business within the organization's territory.

The CLCS Organization also made sure that the profits from the drug trafficking, extortion, and other illegal activity were shared among the leaders of the Organization, including the Mexican Mafia member who served as the Organization's leader and who used those profits to maintain and strengthen his position of power within the state and federal prison systems.

The CLCS Organization's drug trafficking, extortion, and other violence destroyed the fabric of the community.  Residents of the territory lived in fear of being accosted at gunpoint, robbed, or beaten by members or associates of the CLCS Organization.  The CLCS Organization's drug trafficking flooded the neighborhood with drugs that destroyed lives one rock of crack at a time.

Defendant's brief but violent participation in the CLCS Organization activities took place in September 2007.

2

1       In the days leading up to September 15, 2007, the CLCS

2 Organization was running its operations as per usual.  However, one

3 street vendor, F.C., refused to pay the CLCS Organization's demand

4 for a weekly $50 "rent" payment for the right to conduct his business

5 in the CLCS Organization's claimed territory.  Members of the CLCS

6 Organization, including G.M., went to shoot F.C. as retribution for

7 his refusal.  G.M. shot F.C. four times, critically injuring him.

8 G.M. also hit L.A.G., a twenty-three-day-old infant who was sitting

9 in a stroller next to F.C., killing the infant.

10       Mexican Mafia rules dictate that the killing of a child results

11 in an automatic greenlight on the gang responsible, meaning that

12 members of other Mexican Mafia affiliated gangs were to assault or

13 kill members of the CLCS Organization on sight.  In order to protect

14 the CLCS Organization, S.P, the "shot-caller" for the organization

15 ordered that G.M. be killed.

16       Defendant, only days after being released from prison for an

17 extortion conviction, conspired with other members and associates of

18 the CLCS Organization to lure G.M. to Mexico, under the guise of

19 hiding out, in order to kill G.M.

20       Once in Mexico, while F.A., a female associate of the 18th Street

21 Gang, drove a car along a Mexican road with G.M. in the front

22 passenger seat, defendant and fellow 18th Street Gang member J.P.M.

23 threw a rope around G.M.'s neck and strangled him.  While strangling

24 G.M. defendant yelled, "die motherfucker die."[1]  Believing that G.M.

25 was dead, they threw his body over an embankment.

26

27 _____

28     [1] While J.P.M. pulled on the rope, he told defendant that he was
a "good homeboy but had fucked up."

1    G.M. regained consciousness at the bottom of a cliff covered in
2    blood and with a painful "messed up" neck.[2]
3        In addition to planning the killing of and attempting to kill
4    G.M., defendant helped destroy evidence of the crime.  He threw the
5    rope used to strangle G.M. out of the car as they sped away from
6    where they had thrown G.M.'s body over the cliff.  Later, defendant
7    and J.P.M. burned the clothes they had been wearing during the crime.
8    After J.P.M. was arrested on a related state case, defendant told
9    F.A. to be careful and gave her a nominal amount of money to replace
10   the car seat that was stained with G.M.'s blood.  Finally, defendant
11   fled to Mexico after learning on December 6, 2007, that F.A. had been
12   arrested and her house raided.  Defendant also told a witness who had
13   brought him provisions in Mexico that he was hiding out because he
14   and "someone else got a guy drunk, took him down to Mexico, and
15   strangled him."

16   **III. GUIDELINES CALCULATION**

17       Defendant remains convicted of RICO Conspiracy (Count One),
18   VICAR conspiracy to murder (Count 16), VICAR conspiracy to kidnap
19   (Count 17), and conspiracy to commit kidnapping (Count 20).  PSR
20   ¶¶ 29-30.  Counts 16, 17, and 20 group because they involve the same
21   victim or the same act or transaction.  PSR ¶ 31; USSG § 3D1.2(a).
22   Count One and the group of Counts 16, 17, and 20 then group because
23   they involve the same victim and two or more acts or transactions
24   connected by a common criminal objective or constituting the same
25   scheme or plan.  PSR ¶ 31; USSG § 3D1.2(b).

26

27   _____

28       [2] Photos taken a month after the attempted murder showed that
     defendant's neck still bore marks from the attempt and G.M. testified
     at trial that the ligature marks were still visible.

4

These convictions and defendant's conduct result in two guidelines calculations, kidnapping and murder.

**A.   Kidnapping Guidelines**

Count 20, conspiracy to kidnap, Count 17, VICAR conspiracy to kidnap, and the kidnapping conduct in furtherance of Count One are calculated under kidnapping guideline, § 2A4.1.

1.   This Court Should Find an Offense Level of 43 Pursuant to USSG § 2A4.1(b)(7)(A) because Defendant Committed an Attempted Murder during the Kidnapping

| | | |
|---|---|---|
| Base Offense Level: | 32 | § 2A4.1(a) |
| Increase by Cross Reference: Attempted Murder Committed During the Kidnapping | 43 | § 2A4.1(b)(7)(A); § 2A1.1 |
| Offense Level 43 x Criminal History Category VI = Life | | |

Section 2A4.1(a) provides that the base offense level for kidnapping offenses is 32.  However, Section 2A4.1(b)(7)(A) commands that if the kidnapping occurred during the commission of or in connection with another offense, or if another offense was committed during the kidnapping, the Court must apply "the offense level from the Chapter Two offense guideline applicable to that other offense if such guideline includes an adjustment for kidnapping, abduction, or unlawful restraint, or otherwise takes such conduct into account."  As found by the jury, an attempted first degree murder occurred during the kidnapping.  Verdict Form (CR 2298).  Section 2A1.1, the first degree murder guideline, takes kidnapping conduct into account in Application Note 1.

Application Note 4 of Section 2A4.1 further specifically commands, "if an offense involved a kidnapping during which a participant attempted to murder the victim under circumstances that would have constituted first degree murder had death occurred, the

offense referenced under subsection (b)(7) would be the offense of first degree murder."

Defendant cites to an out-of-circuit case that, at best, misreads and, at worst, ignores this clear guidance from the Sentencing Commission.  The Sentencing "Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports." Kimbrough v. United States, 552 U.S. 85, 96 (2007) (citing USSG § 1A1.1, intro. comment., pt. A, ¶ 3); see also, United States v. Goldberg, 491 F.3d 668, 673 (7th Cir. 2007) (stating that the Sentencing Guidelines were "drafted by a respected public body with access to the best knowledge and practices of penology").  This Court should respect that expertise of the Sentencing Commission and follow the clear instruction of the Sentencing Commission to affix an offense level of 43 to defendant's kidnapping conduct that included an attempted first degree murder.

2.   Alternatively, the Court Should Find an Offense Level of 41 Pursuant to USSG § 2A4.1(b)(7)(B) because Defendant Attempted to Murder during the Kidnapping

| Base Offense Level: | 32 | § 2A4.1(a) |
|---|---|---|
| Increase by Cross Reference: Attempted Murder Committed During the Kidnapping | 41 | § 2A4.1(b)(7)(B); § 2A2.1 |
| Offense Level 41 x Criminal History Category VI = 360-Life | | |

Again, Section 2A4.1(a) provides that the base offense level for kidnapping offenses is 32.  However, section 2A4.1(b)(7)(B) similarly commands that if the victim was kidnapped during or in connection with another offense, or if another offense was committed during the kidnapping, the offense level is four plus the offense level from the offense guideline applicable to that other offense.  Here, that other

1   offense is attempted murder, which is calculated under Section 2A2.1.

2   Section 2A2.1(a)(1) provides for a base offense level of 33 and is

3   increased by four levels for the victim sustaining life-threatening

4   injury (§ 2A2.1(b)(1)(A)), resulting in a total Section 2A2.1 offense

5   level of 37.  Section 2A4.1(b)(7)(B) then requires the addition of

6   four more levels, resulting in an offense level of 41.

7        Attempted murder under 2A2.1 is the appropriate cross-reference

8   because an attempted murder actually occurred and that murder was

9   within Section 1B1.3's definition of relevant conduct.

10       Supreme Court precedent along with statutory history make clear

11  that the sentencing court must consider not just the convicted crime

12  alone but the full landscape, both positive and negative, when

13  sentencing a defendant, provided that landscape is supported by

14  reliable evidence.  United States v. Rivera, 527 F. 3d 891, 911 (9th

15  Cir. 2008) (explaining that the sentence must be based on an

16  individualized determination based on all the facts) (emphasis

17  added); Pepper v. United States, 131 S. Ct. 1229, 1240 (2011) ("[T]he

18  punishment should fit the offender and not merely the crime.")

19  (emphasis added).  The sentencing statute is unequivocal: "No

20  limitation shall be placed on the information concerning the

21  background, character, and conduct of a person convicted of an

22  offense which a court of the United States may receive and consider

23  for the purpose of imposing an appropriate sentence."  18 U.S.C.

24  § 3661, emphasis added.  This is because "[h]ighly relevant if not

25  essential to [the judge's] selection of an appropriate sentence is

26  the possession of the fullest information possible concerning the

27  defendant's life and characteristics."  Williams v. New York, 337

28  U.S. 241, 247 (1949) (footnote omitted).  "A sentencing judge may

even consider past criminal behavior which did not result in a conviction." <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 573 n.19 (1996).

      3.   <u>Alternatively, the Court Should Find an Offense Level of 37 Pursuant to USSG § 2A4.1(b)(7)(B) because Defendant Conspired to Murder in Connection with the Kidnapping</u>

| Base Offense Level: | 32 | § 2A4.1(a) |
|---|---|---|
| Increase by Cross Reference: Conspiracy to Murder Committed During the Kidnapping | 37 | § 2A4.1(b)(7)(B); § 2A1.5 |
| Offense Level 37 x Criminal History Category VI = 360-Life | | |

Again, Section 2A4.1(a) provides that the base offense level for kidnapping offenses is 32. And again, Section 2A4.1(b)(7)(B) commands that if the victim was kidnapped during, or in connection with another offense, or if another offense was committed during the kidnapping, the offense level is four plus the offense level from the offense guideline applicable to that other offense. If the court does not apply the Section 2A2.1 attempted murder guideline as the cross-reference under Section 2A4.1(b)(7)(B), the Section 2A1.5 conspiracy to murder guideline is the appropriate cross-reference and the guidelines range still includes a life sentence. Section 2A1.5 specifies a base offense level of 33. Section 2A4.1(b)(7)(B) then increases that base offense level by four to 37.

**B.  Murder-Related Guidelines**

| Base Offense Level: | 33 | § 2A1.5(a) |
|---|---|---|
| Increase by Cross Reference: Offense Resulted in an Attempted Murder with Life-Threatening Bodily Injury | 37 | § 2A1.5(c)(2); § 2A2.1(a)(1); (b)(1)(A) |
| Offense Level 37 x Criminal History Category VI= 360-Life | | |

8

The guidelines for Count 16, the VICAR Conspiracy to Murder, and the murder conduct under Count One can be calculated under the Section 2A1.5 conspiracy to murder guideline.  Under Section 2A1.5 the base offense level is 33.  However, Section 2A1.5(c)(2) provides that if the offense resulted in an attempted murder, the Court must apply the Section 2A2.1 attempted murder guideline.  The 2A2.1 attempted murder guideline begins at 33 (§ 2A2.1(a)(1)) and is then increased by four because the victim sustained permanent or life-threatening injury (§ 2A2.1(b)(1)(A)), resulting in an offense level of 37.

    **C.**  **Whether Computing the Kidnapping or Murder Guidelines, the Four-Level Increase for "Permanent or Life-Threatening Bodily Injury" Should Apply because the Victim did, in Fact, Sustain a Permanent and Life-Threatening Injury.**

Both the kidnapping guideline, USSG § 2A4.1(b)(2), and the attempted murder guideline, USSG § 2A2.1(b)(1), provide for a four-level increase if the victim sustained permanent or life-threatening bodily injury.  Application Note J of Section 1B1.1 defines that injury as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent."  Specifically, in reference to kidnapping, the Application Note further provides, "In the case of a kidnapping, for example, maltreatment to a life threatening degree (e.g., by denial of food or medical care) would constitute life threatening bodily injury."  This Application Note answers this question.  If deprivation of food or medical care can constitute life threatening bodily injury then twisting a rope around a victim's neck until he passes out apparently dead while screaming

"die motherfucker die," then throwing the unconscious body over an embankment unquestionably does.

G.M. and eyewitness F.A. testified at trial regarding how Macedo was strangled so violently that he was rendered extremely bloodied and unconsciousness. (4/19/12 RT 120-21; 4/24/12 RT 52-54.)  F.A. further testified that she and J.P.M. checked for vital signs to confirm that the unconscious G.M. was dead and that she only detected a faint pulse, while J.P.M. could not hear a heartbeat.  (4/24/12 RT 52-54.)  Defendant Perez and J.P.M. then dumped Macedo's unconscious body over the side of a cliff.  (4/19/12 RT 122, 4/24/12 RT 55.) Photographs presented at trial taken by the LAPD approximately six weeks after G.M.'s strangulation show ligature marks around G.M.'s neck in the form of extreme bruising.  (4/19/12 RT 126-30.) Approximately 4½ years later, G.M. testified that the strangulation resulted in scarring that remained to that date.  (4/19/12 RT 128.) See, United States v. Cree, 166 F.3d 1270, 1272 (8th Cir. 1999) (victim's testimony attesting to scarring sufficient to support judicial finding of permanent injury).

Believing that this enhancement only applies if the victim "continue[s] to suffer from a 'permanent or life-threatening' injury," defendant claims that the evidence failed to show any "long-lasting physical effect of the outcome of this incident" and therefore, this enhancement should not apply.  (Defendant's Objections to the PSR (CR 3297), pp.5-6.)  This unduly narrow reading of § 1B1.1 excises its initial clause that permanent or life-threatening injury includes "injury involving a substantial risk of death," as well as its apt example of expected use in the kidnapping context, i.e., "maltreatment to a life-threatening degree, e.g., by

1   denial of food or medical care."  Neither requires the permanence

2   that defendant insists is necessary, as this Court has long held.

3   See, e.g., United States v. Hinton, 31 F.3d 817, 825-26 (9th Cir.

4   1994) (rejecting claim in attempted murder context that enhancement

5   only applies where injury is permanent, clarifying that it also

6   applies to life-threatening situations, and finding profuse, but non-

7   fatal, temporary blood loss from a stabbing was sufficient to warrant

8   application of this enhancement.); United States v. Morgan, 238 F.3d

9   1180, 1188 (9th Cir. 2001) (maltreatment during kidnapping can

10  sustain application of enhancement).

11       In a remarkably similar case, United States v. Bryant, 913 F.3d

12  783 (9th Cir. 2019), the Ninth Circuit rejected the argument that

13  injuries must be permanent to be considered life-threatening under §

14  1B1.1.  Bryant, 913 F.3d at 787.  The defendant in Bryant kidnapped

15  and later strangled his girlfriend to the point of unconsciousness.

16  Id. at 785.  Based on the cross-reference in the kidnapping

17  guideline, the sentencing court utilized the attempted murder

18  provision, 2A2.1, to calculate the defendant's offense level.  Id. at

19  787.  It then applied § 2A2.1(b)(1)(A)'s four level enhancement for

20  defendant having caused a "life-threatening" injury.  Id.  In doing

21  so, this the court dismissed the defendant's argument that

22  "unconsciousness was [in]sufficient to qualify as a life-threatening

23  injury," and ruled that "injuries resulting in a substantial risk of

24  death need not be permanent."  Id.  It then concluded by finding "no

25  error in the court's conclusion that [the victim] faced a substantial

26  risk of death when she was strangled to the point of unconsciousness,

27

28

11

1  which qualifies as a life-threatening bodily injury sufficient to

2  warrant the enhancement."  Id.[3]

3       Defendant argues against this enhancement by misreading and

4  misapplying United States v. Chao Fan Xu, 706 f.3d 965 (9th Cir.

5  2013).  In fact, a true reading of this case demonstrates that the

6  victim's injury in this case should result in the four-level

7  enhancement.

8       Chao Fan Xu considered which subsection of the Section 2S1.1

9  money laundering guideline should apply: (a)(1), which applies the

10 offense level from the underlying specified unlawful activity ("SUA")

11 if defendant committed that SUA or is liable for it as relevant

12 conduct; or (a)(2), which applies the offense level based on the

13 quantity table in 2B1.1.  The government was unable to trace the

14 funds to establish the underlying offenses and thus had to rely on

15 relevant conduct.  Contrary to defendant's argument, Chao Fan Xu does

16 not prohibit using foreign conduct in a relevant conduct analysis.

17 Rather, Chao Fan Xu found that defendant's foreign conduct was too

18 attenuated to the United States, where that conduct (the theft of

19 money from the Bank of China) only indirectly affected the United

20 States and involved determining whether than conduct violated foreign

21 law.  Chao Fan Xu, supra, at 992.  In reaching this conclusion, the

22 court considered other cases that are more similar to this case and

23 in which a sufficient nexus was found.

24      In United States v. Farouil, 124 F.3d 838 (7th Cir. 1997) it was

25 proper to consider drugs possessed by a co-coconspirator in another

26 country that were "directed against" the United States.  Similarly,

27 _____

28      [3] Defendant is certainly subject to 2-level for serious bodily
   injury.

1  in United States v. Greer, 285 F.3d 158 (2d Cir. 2002) it was proper

2  to consider drugs possessed abroad but intended for the United

3  States.

4       This case is much closer to Farouil and Greer than Chao Fan Xu.

5  Unlike Chao Fan Xu, this case does not involve wholly foreign conduct

6  of stealing money from a foreign entity in violation of that foreign

7  country's law.  Rather, it consisted of conduct directed at the

8  United States, the killing of a United States citizen[4] because of his

9  conduct in the United States that subjected a United States-based

10 entity (the CLCS Organization) to consequences from another United

11 States-based entity (the Mexican Mafia).

12      Further, inclusion of the injury victim sustained in Mexico from

13 defendant's conduct in Mexico in defendant's offense level is

14 consistent with RJR Nabisco, Inc. v. European Community, 136 S.Ct.

15 2090 (2016), which abrogated another part of Chao Fun Xu that had

16 limited the extraterritoriality of RICO.

17      Finally, defendant is simply wrong when he states, "in the

18 absence of a conviction for a substantive offense this court must

19 rely on the Relevant Conduct provisions of Guidelines when

20 considering the applicability of this enhancement." (Defendant's

21 Objections to the PSR (CR 3297), p.4.)  The object of the conspiracy

22 is not relevant conduct, it is the object of the conspiracy, and in

23 this case, that defendant agreed to a conspiracy to kill G.M. was

24 found by a jury beyond a reasonable doubt.

25

26      [4] It is elucidating to note that defendant's foreign conduct,
   the attempted murder of a United States national in another country,
27 is specifically criminalized under United States law.  See 18 U.S.C.
   § 1119.  This obviates any need to analyze whether the conduct
28 violated foreign law, taking this case out of the framework of Chou
   Fan Xu.

**IV.   THE GUIDELINES AND THE SECTION 3553(A) FACTORS**

   **A.   The Guidelines are the Starting Point in Determining an Appropriate Sentence**

   The starting point for the Court in determining the appropriate sentence under the Sentencing Reform Act as modified by United States v. Booker, 543 U.S. 220 (2005), is the analysis and consideration of the Guideline factors.  543 U.S. at 259 (noting that Sentencing Reform Act "nonetheless requires judges to take account of the Guidelines together with other sentencing goals"); see also United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006) (noting that the "[c]ontinuing duty of district courts to consult the Guidelines is statutory").

   In United States v. Carty, 520 F.3d 984 (9th Cir. 2008) (en banc), the Ninth Circuit declined to adopt a presumption of reasonableness for appellate review of within-Guideline sentences, but it stated that "normally" a Guideline sentence will not be found unreasonable on appeal.  520 F.3d at 988.  Carty also provided a detailed framework for federal sentencing.  The Court must begin by determining the applicable guideline range - this range is a "starting point" and "initial benchmark."  Carty, 520 F.3d at 991. The Court must then ensure that the parties have an opportunity to argue for the sentence that they believe is appropriate.  Id.  The Court must also consider § 3553(a) in conjunction with these arguments.  Id.  The Court cannot presume that a Guideline sentence is reasonable and cannot give the Guidelines more or less weight than the other § 3553(a) factors.  Id.  The sentencing must be an "individualized" determination.  Id.  Importantly, in deciding the extent of any proposed departure or variance from the Guideline

1  range, the Court must consider whether the justification is

2  sufficiently compelling to support the degree of the variance.  Id.

3  The greater the variance, the more persuasive the justification

4  should be "because other values reflected in Section 3553(a) - such

5  as, for example, unwarranted disparity" counsel against the variance.

6  Id. at 991-92.  Also importantly, the Court must provide enough of an

7  explanation to enable meaningful appellate review, and this will vary

8  depending upon the complexity of the case.  Id. at 992.

9      **B.   Analysis of the Section 3553(a) Factors**

10      The applicable Sentencing Guidelines range, while not

11  definitive, provides the starting point for finding a reasonable

12  sentence and must then be considered with the factors set forth in

13  § 3553(a).  See Cantrell, 433 F.3d at 1279.  "To comply with the

14  requirements of Booker, the district court must have sufficiently

15  considered the Guidelines as well as the other factors listed

16  in  3553(a).  This requirement does not necessitate a specific

17  articulation of each factor separately, but rather a showing that the

18  district court consider the statutorily-designated factors in

19  imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125

20  (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d

21  913, 918 (9th Cir. 2006)).

22      The facts of this case, including those in mitigation,

23  demonstrate that the government's recommendation described herein

24  fulfills the statutory purposes of 18 U.S.C. § 3553(a) and is an

25  "individualized determination" of an appropriate sentence.[5]  See

26  Carty, 520 F.3d at 991.

27

28      [5] The § 3553(a) factors include such things as:
        *(footnote cont'd on next page)*

15

1    The nature and circumstances of the offense could hardly be more

2    aggravating.  Defendant, in order to maintain or increase his

3    position in a violent and terrible racketeering enterprise, and only

4    days after being released from prison for a prior extortion,

5    conspired with other organization members to kidnap the defendant in

6    order to kill him.

7    Defendant's history and characteristics are similarly

8    aggravating.

9    Defendant's criminal history begins with a juvenile murder

10   adjudication from when in 1993, when he was 16 years old and shot and

11   killed a 20-year-old woman, who was an innocent bystander in a drive-

12   by shooting that was directed at the Carnales gang, an 18th Street

13   Rival.  Before firing multiple shots at a group of Carnales Gang

14   members, defendant shouted "18th Street" in Spanish to which one of

15   the rival gang members responded "Carnales."  After the shooting,

16   defendant bragged that he has shot someone and when asked if the

17   person was dead, replied, "Yeah.  I know I killed em."  PSR ¶ 51;

18   CR2486.

19   Next, in January 2003, defendant was arrested for vandalism

20   after police officers saw defendant and others crossing out Carnales

21   gang graffiti and paining their own 18th Street gang graffiti.

---

23   (1) the nature and circumstances of the offense and the history
     and characteristics of the defendant; (2) the need for the sentence
24   imposed -- (A) to reflect the seriousness of the offense, to promote
     respect for the law, and to provide just punishment for the offense;
25   (B) to afford adequate deterrence to criminal conduct; (C) to protect
     the public from further crimes of the defendant; (D) to provide the
26   defendant with needed educational or vocational training, medical
     care, or other correction treatment in the most effective manner; . .
27   . [and] (6) the need to avoid unwarranted sentence disparities among
     defendants with similar records who have been found guilty of similar
28   conduct . . . .
     18 U.S.C. § 3553(a).

16

Defendant initially fled from officers and was found later spray painting another location.

A couple months later, in March 2003 defendant was arrested being a gang member with gun after officers saw him toss a loaded chrome semi-automatic handgun.  And then another couple months after that, in May 2003, defendant was arrested for providing false information to a police officer.

In 2005 defendant was arrested for receiving stolen property after he and other men were seen stripping a car of its parts.

In 2006, defendant, then 29 years old, was arrested for kidnapping a 15-year-old girl and demanding $500 ransom from her father.  The young victim told police officers that she was walking on the street when defendant drove alongside her and yelled at her to get into the car.  When the girl refused, defendant yelled, "Somebody owes me some money, get in the car or you'll see."  The victim later escaped and called police.  She explained that she complied with defendant's order because she was scared.  After defendant was arrested, he denied kidnapping the girl and making the calls.  When shown call logs that contradicted him, he told police he did not want to talk anymore.  Defendant was later convicted of extortion and it was from this sentence that defendant had just been released from when committed the instant crimes.

The public needs to be protected from, and defendant needs to be deterred from future participation in violent gang crimes.  A sentence consistent with the government's recommendation is a just punishment that promotes respect for the law and provides for deterrence and protection of the public.  See 18 U.S.C. § 3553(a)(2); see also United States v. Zakhor, 58 F.3d 464, 466 (9th Cir. 1995)

17

(noting that the "Sentencing Commission . . . has a mandate to create sentencing policies that consider 'the deterrent effect a particular sentence may have on the commission of the offense by others'") (citation omitted).

In terms of sentencing disparity, the government submits that the Court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6); <u>see also</u> <u>United States v. Guerrero-Velasquez</u>, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that guidelines "help to maintain uniformity in sentencing throughout the country").  Moreover, the Ninth Circuit has observed that a sentence consistent with the guideline range is unlikely to be disparate because such a sentence "represents the sentence that most similarly situated defendants are likely to receive."  <u>United States v. Becerril-Lopez</u>, 541 F.3d 881, 895 (9th Cir. 2008).  Here, however one calculates the guidelines, life is within the guidelines range.

In this case, a sentence consistent with the guidelines would address all of the facts in this case when taken in consideration with the § 3553(a) factors, including those in aggravation and mitigation.

**V.   CONCLUSION**

No matter what offense level the court finds, the section 3553(a) factors all support a life sentence.  Therefore, the government respectfully requests that this Court sentence defendant to life imprisonment and a $100 special assessment.